The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. The first case for argument this morning is 19-2340, S.K. Hynix v. Iancu. Mr. McAuliffe, whenever you're ready. Thank you, Your Honor. May it please the Court. Good morning, Your Honors. Joe McAuliffe for Appellant S.K. Hynix. Your Honors, in the proceedings below, the Board adopted a brand new theory in the final written decision to uphold Claims 40 and 41 in view of Ellsbury. The petition had argued that Claims 40 and 41 were obvious over Ellsbury alone. In particular, the petition argued that Ellsbury rendered obvious that the recited buffer circuits further included the output buffers recited in Claim 40. The Board, in its final written decision, did not decide that issue. Instead, the Board decided the issue of whether Ellsbury discloses the output buffers of Claim 40 in finding that we did not. There is a clear distinction in patent law. Mr. McAuliffe, Mr. McAuliffe. Yes, Your Honor. Sorry to interrupt, but firstly, can you keep your voice a little down? Yes. Secondly, I mean, we've had a 28-J letter, appropriately, citing our recent case in Fandul. And I, frankly, am having a hard time differentiating between what went down here and what went down in Fandul. And I know you alternatively said, well, if we're distinguishing it, and if not, Fandul's wrong. Well, if Fandul's wrong, that's kind of a problem for our panel here. So tell us how you think it can be fairly distinguished, please. Oh, it's very easily distinguished. In Fandul, Your Honor, what the court held was that the petitioner was on notice that the Board was going to address and decide an argument or a theory included in the petition. Here, the Board did not address or decide the argument that we included in our petition. It addressed and decided one that was not included in our petition that was wholly different. We argued it would have been obvious to modify Ellsbury to further include the output buffers of Claim 40. The Board said we had not proven that Ellsbury disclosed the output buffers of Claim 40. Mr. McAuliffe, this is Judge Chun. Okay, so I see your argument today is that you made a specific argument that it would have been obvious to modify Ellsbury to have both an input buffer and an output buffer, both of which are associated with the right command. And you're arguing to us today that the Board failed to appreciate that argument in your petition. But when I look at your petition, I don't quite see your articulation of why Claim 40 is unpatentable in the way that I just heard you argue it today in front of us. The way I understand your petition when it comes to Claims 40 and 41 was that the bidirectional drivers of Ellsbury could easily be implemented using something called tri-state buffers. But you don't take the extra step of identifying what is it in Ellsbury that corresponds to an input buffer and also a separate thing that corresponds to an input buffer as well as an output buffer. And then even if it's lacking that, why would you modify Ellsbury to have both an input buffer and an output buffer, both associated with the right command? Where is that in your petition? Right. Well, Judge Shen, first of all, for Claim 40, I didn't have to show for Claim 40 both. The input buffer is recited in Claim 39, and the Board found that Ellsbury in its analysis of Claim 39, from which Claim 40 depends, the Board found that Ellsbury discloses the input buffer. So for Claim 40, I just had to show it was obvious to further include the output buffers. And that is exactly the theory in the petition at Joint Appendix Page 52, 53, I believe, at the bottom of the page, we specifically say that Ellsbury renders obvious that each respective buffer circuit further includes the output buffers of Claim 40. So we did not take on the burden. Right, but the problem here is that, you know, just invoking the word obvious and then quoting the language from the claim isn't much of an argument in terms of a theory of understanding why it would be obvious. And especially when all the surrounding language in your petition is really just talking about how it would be obvious to implement the bidirectional drivers of Ellsbury using tri-state buffers. So you still have to explain in your obviousness theory, in your modification theory, why if there are not separate input buffers and output buffers associated with the right command in Ellsbury, why it would be nonetheless obvious to add an output buffer to Ellsbury, which the Board agreed with you already includes an input buffer associated with the right command. Now what's wrong with your petition? Well, so the sentence I pointed to was the end of that section. There's more analysis in there, including citations to Dr. Stone's testimony and analysis and to our prior analysis of Claim 14, which also requires essentially a tri-state output buffer in the right direction, just like... Well, as I understand, Claim 14 requires a tri-state buffer, right? Well, it's in the right direction, and then that claim requires a right command. In the right direction, that's fine, but Claim 14 does not require both an input buffer and an output buffer in the right command direction. Is that right? That just says tri-state buffers in the right direction. Sure, but the Board found that that claim was an obvious variation of Ellsbury. That's right. But that's a different claim than Claim 40 and 41, which has this extra element. Yes, it has both an input buffer and an output buffer, both associated with the right command. There's no question, and the Board found Ellsbury disclosed the input buffer, and in the context of Claim 14, the Board found the output buffer in the right direction would have been an obvious variation of Ellsbury, and that was our argument, the obvious variation. We were not arguing that Ellsbury disclosed those output buffers in the right direction. I'm also not arguing that I only had to show one or the other. I conceived it. It has both inputs and output buffers, Claim 40. But we showed that Ellsbury had the input in the analysis of Claim 39, and we said it was an obvious variation to further include the output. And we cited not only our analysis of Claim 14, but the evidence and analysis of Dr. Stone in his book, his testimony where he says doing that with a tri-state buffer would have just been use of a known structure. It would provide reliable results with no unpredictable results. He said in his book there's a motivation to do it because he cited page 74 of his book that said you want to use these tri-state buffers where you have multi-tap transmission lines, and Ellsbury is a multi-tap transmission line. And, in fact, on that same page, he discloses both input buffers and output buffers implemented using tri-state buffers. So we did have… Wait a second. Where are you talking about? It's page 74 of Dr. Stone's book. It's the page where he says, and it's cited by both our papers and the board, where he says you should use tri-state buffers where you have a multi-tap transmission line. I mean, are you pointing to what? Figure 4.7? No, it is not figure 4.7. I believe it was figure 2.8. The problem here is the basic problem is that the board could see there was a D flip-flop in Ellsbury figure 4. Right. And the board said, okay, we'll conclude that that's the equivalent and corresponds to an input buffer. Right. But there's nothing else inside those little boxes of the bidirectional drivers in Ellsbury that could also be, in addition to that D flip-flop, something else that corresponds to an output buffer. With respect, Your Honor, you're doing what the board did. I didn't have to show Ellsbury disclosed the additional output buffers, and I didn't seek to. All I sought to prove was that it would have been obvious to modify Ellsbury to include them, to further include them, and that is exactly the language we use in our petition because that's exactly the language in the claim, in Claim 40. Okay. What is the exact language you use in your petition that says, okay, okay, okay, there is no output buffer in Ellsbury, but it would be obvious to add an output buffer to Ellsbury? It is at Joint Appendix page 5253. Right. I don't see those words on A5253. Give me one minute, Your Honor. I have it right here. At the last sentence on that page, thus Ellsbury renders obvious that each respective buffer circuit further includes output buffers, and then there's an and in brackets, and then there's remaining claim language from Claim 40. Right. So that sentence says, thus Ellsbury renders obvious that, the quoted claim language. Thus Ellsbury renders obvious the claim language. Right. Which says further includes. Yes, Your Honor. That's the conclusion. Well… It's not really an analysis, is it? Well, no, but there's more analysis. As I said earlier, we cited Claim 14 and Dr. Stone's analysis, and if you look at Dr. Stone's analysis, I don't see anybody who comes to the conclusion that we were arguing Ellsbury disclosed it. First of all, neither the petition nor Dr. Stone's testimony ever says it discloses it, and there's a distinction between a prior art reference disclosing something and something being obvious from that prior art reference. Secondly, everything that Dr. Stone says all goes to an obvious variation of Ellsbury. Using these tri-state buffers was known. They created predictable and reliable results. There were motivations to do it. Nothing in our papers could be read to mean that we were saying Ellsbury disclosed those output buffers, but yet the board said you didn't prove Claim 40 unpatentable because you didn't prove Ellsbury disclosed those output buffers. They changed theories on us and didn't address the theory that we put in our papers, and that's a violation of my client's due process and APA rights. In fact, I think – yes, Your Honor? No, go ahead and finish your thought. I was just going to suggest we hear from the other side, but finish your thought. Well, my thought is this puts this issue squarely in the Nike, Enrique Magnum Oil, and SAS cases, where in each case the board came up with a new theory that had never been in anybody's paper. This theory was that the board decided, and it's with respect to the output buffers of Claim 40, was never in our petition. The patent owner never raised it. The board never raised it. In fact, this is a somewhat more egregious case I would suggest to you because in those cases, the board came up with a theory on behalf, essentially, of one party and resolved it against the other party. Here, the board came up with a theory basically on behalf of my client and resolved it against my client. We never made this argument that they decided, and that violated my client's rights. Why don't you not go for rehearing or reconsideration on this issue? Well, obviously, we're not required to do that, but there's a lot of reasons not to go for rehearing or reconsideration before the PTAB. One big one is timing. There's no time limit for them to decide it. This patent is the subject of a stage parallel litigation, but it's still subject to a parallel litigation, and the continuation of it has been asserted. It was our view that appeal was a better route for us, and I think it was Magnum Oils that were entitled to elect appeal rather than the hearing, and we did. Okay. Why don't we hear from the head of the… Well, I don't know if my time… I didn't hear a beeper, but if you want to go to the… I'm happy to let the other side have their say if that's what you'd like, Chief Justice. I'm sorry. Elise, did we hear a beep? Yes, it may have been a little soft, and I'll try to do that better next time. I'm very sorry. It's okay. Mr. McBride. Good morning, Your Honors. May it please the Court. Chief Judge Prost, I believe you have it correct with the FanDuel v. Interactive Games decision. Well, let me start with—excuse me, Mr. McBride, but let me start you with the rehearing. The board is—or the office is suggesting, is it, that you can't have a kind of APA due process violation if you don't take advantage of the opportunity for rehearing before the board, is it? Well, I think our point with the rehearing is that—well, in this case, you know, first of all, SK Hynix certainly had notice of the ground of unpatentability that was going to be reviewed by the board because they presented it in their petition. So they had notice. At the moment, they filed their petition. They had an opportunity to address that ground. And then our point with the request for rehearing was that if they—that was a perfect opportunity for them to have another opportunity to address the issue with respect to Claims 40-41. If they thought that the board's analysis concerning Claims 40-41 was inconsistent with how it analyzed Claim 14, or if they thought that the board misunderstood or misapprehended the arguments that they were making in their petition or that Dr. Stone made in his declaration, that would have been the perfect opportunity to bring that to the attention of the board. So they certainly had, in the director's view, you know, fair notice and opportunity of the ground that the board was going to review. I don't think you're really answering my question. I understand your position that they had another bite at the apple if they chose to take it. But rehearing is rarely granted. So is it your view that you cannot sustain a due process or APA petition if you don't take advantage of the rehearing? I mean, it seems like in FanDuel, I mean, this court said that the time to disagree with the board's decision is after the board's decision, either in a request for rehearing or by— I don't think they're barred from making the argument. I just think, at least in the back of this case, it's not a very convincing argument. I mean, there could be a different situation where perhaps they didn't have an opportunity if a new ground of rejection was somehow raised. You know, maybe that would be a situation where you would have a viable due process claim without filing a request for rehearing. But at least in this case— Okay. But the bottom line is they can make this argument here on appeal. You agree with that? I think they can make that. You're just making an observation that they—oh, there was an opportunity to raise it on reconsideration. But they're not required to in order to file this appeal and make this argument? Correct. Yes. Okay. Well, the second part to that question is not whether they're allowed to raise it, but whether it's appropriate for us to find in their favor, even though they forfeited or they failed to file for reconsideration or rehearing. Right. And the answer is to entertain a due process or an APA allegation here, notwithstanding the failure to file for rehearing. Correct? Correct. Okay. We were going to talk about FanDuel, so please proceed. Yes. So I think the FanDuel case is actually very similar to this case and involves a situation where the board in its institution decision went one way on patentability. The patent owner didn't really challenge the merits of that patentability determination in its patent owner response or its preliminary response. And then the board, after fully vetting all of the evidence presented, changed its decision. And in FanDuel, this court said that it encouraged the board to actually change its decision if it was convinced that its initial decision was wrong. And there's a number of reasons for doing that. There's a different standard for determining patentability in an institution decision where you just have to look at whether there's a reasonable likelihood that at least one claim would be proven unpatentable, as opposed to a final written decision where you're looking at each claim and you have to determine patentability by the preponderance of the evidence. There are very different analyses and standards. And then also the burden always remains on the petitioner throughout the proceeding, regardless of whether the patent owner files a patent owner response or regardless of what arguments the patent owner makes. And also in FanDuel, this court pointed out there's no pre-decisional opportunity for a petitioner to disagree with the board. That's not a requirement. The time to disagree with the board's decision is after it makes its decision, and you can do that by filing a request for rehearing or appealing to this court. So I don't think there's any way to distinguish FanDuel from the facts of this case. So as I understood Mr. McAuliffe's argument, well, it's not something that necessarily fits within the facts of FanDuel, because as I understand his argument today, it's that in their petition, their argument for unpatentability of claims 40 and 41 was based on argument number one, but the board never actually addressed argument number one. And it misunderstood argument number one and ended up addressing a never-made argument number two and finding that the claims were not proven to be unpatentable. So perhaps in a sense what he's arguing is that it needs to be vacated and remanded to give the board the chance to actually answer the argument that was raised in the petition. Could you explain why you don't believe that's necessary, given their view that the board misconstrued the petition as arguing that Ellsbury discloses the claimed output buffer, when really what Hennig was arguing all along was that it's merely an obvious thing to do to add the output buffer? Yeah. Well, Judge Shedd, I think you kind of nailed it in your analysis of what's in their petition. If you look at their petition at APPX 5253 for claim 40, it's a one-page analysis. It's fairly conclusory. I mean, they just identify what Ellsbury discloses, and then at the very end they just say, you know, thus Ellsbury renders obvious that quote, and then they just quote the claim limitation, but they don't give any analysis as to why it would have been obvious to add an output buffer to Ellsbury's system as claimed. That's really what's missing, and if you look at the board's analysis, that's exactly what it found. And Stone's declaration doesn't go any further. If you look at his declaration at APPX 1834 to 1835, it's also very short. It's just over one page with, you know, six paragraphs, and it has the same conclusion. It talks about what's disclosed in Ellsbury, and, you know, for the reasons set forth, it would have been obvious to implement the cited combinations of Ellsbury and Stone, such that, quote, and it just quotes the limitation, but it doesn't have the analysis of why it would be obvious to modify Ellsbury as disclosed in Figure 4 to include the output buffers, which, as the board found, they don't appear in Ellsbury Figure 4. If you look at Ellsbury and how the board analyzed it, they looked at Ellsbury Figure 4 and found that they agreed with SK's arguments in its petition that the bi-directional signal drivers, elements 402 and 404, which included these D flip-flops, those were the claimed input buffers, but if those are the claimed input buffers, the board found that what you're missing is where's the additional disclosure of the output buffers that's required by Claims 40 to 41, and that's just missing from the prior art. It's missing from the petition. It's missing from Dr. Stone's declaration. Mr. McBride, I get the sense that the other side thinks that if you agree that it would be obvious to have tri-state buffers implemented in Ellsbury, then you necessarily agree that it would be obvious to have output buffers in Ellsbury. Can you speak to that question? There's an assumption that tri-state buffers are output buffers. So I heard SK Hynix's counsel make that argument, but I didn't see that argument in the petition. I didn't see that argument made before the board. It's an interesting argument, but they just didn't make it. If that was their case, I believe they should have put that in their petition. Dr. Stone should have said something about that. They could have put that in a request for rehearing. They could have put that in their appeal brief or their reply brief. I mean, I think it's somewhat telling that after the director filed our intervener brief, kind of pointing out that you still haven't pointed out where the prior art, where in Ellsbury and Stone, this additional limitation of the output buffer associated with the right command, where is that in the prior art and how do you map that to the claim? In their reply brief, they still didn't do that. Instead, they pointed to their own specification in the 907 patent and pointed out that they have written description support for the limitation. But this is not a written description rejection. It's a prior art rejection based on obviousness. So I just haven't seen it. I haven't seen that argument made anywhere. And, you know, the board gets deference for how it interprets, you know, the factual findings that it makes as to what the prior art discloses. And I think its analysis here is fairly thorough. It considered all the evidence that S.K. Hynix presented, and they just found that it was not persuasive enough to meet the burden of persuasion here, of a preponderance of the evidence. And if you take a step back, they did challenge 65 claims in the 907 patent, and they were successful in 63 of the 65. So they did a fairly thorough job here, and they agreed with almost everything S.K. Hynix said. It's just they just didn't see these additional limitations of claims 40 to 41. They didn't see it in the prior art. They didn't see it in the arguments. They didn't find that it would have been obvious, and they explained why. And I think that's just, you know, one deficiency in their petition and their arguments. Since you're here, do you happen to know why the patent here wants both an input buffer and an output buffer associated with the write command? You know, I am not an expert in electrical engineering, so I don't know enough to tell you why they would want the additional limitation of an output buffer in this particular configuration. But, I mean, I haven't seen that argument made that it would necessarily be required or essential, or it's just not clear from the record. Thank you. I'm sorry. Go ahead. Anything further I was asking? I was going to just touch on it. You know, S.K. argued in the reply brief and during their opening argument. They discussed the Nike versus Adidas case as supporting their case. I just wanted to point out that that was a case involving new proposed substitute claims, and if the board is going to sui sponte, apply prior art to reject new claims, it's only fair that you give notice of that, you know, rejection to the patent owner and give them an opportunity to respond. That's very different than what's happened here, where S.K. Heinex was on notice of the ground of unpatentability when they filed their petition, and the board was simply just determining whether they met their burden of proving that ground of unpatentability. As far as the alternative ground argument, I think it's pretty clear based on the board's decision and how the arguments were presented that the board certainly considered all of the arguments based on Ellsbury in combination with Stone. The board's decision cites to the Stone Declaration and, for example, paragraphs 502 to 504 of the Stone Declaration, which expressly discuss the Stone textbook and how it, in combination with Ellsbury, allegedly renders the claims unpatentable. In fact, Stone's declaration only argues that the claims are unpatentable based on the combination of Stone and Ellsbury. I think the board certainly did an adequate job of considering that argument. Unless the panel has any further questions for me, I'm happy to yield the rest of my time. Good timing. Given the confusion, we'll restore your five minutes of rebuttal time, so please proceed if you need it. Thank you, Your Honor. I appreciate that. I'd like to point out first that in response to Judge Chen's question about whether a remand is necessary counsel for the director, I believe said certain things about our petition and the evidence. I would like to point out that that is the first time anyone from the PTO has addressed our arguments at the Claim 40's obviousness. The first time in these proceedings. It's clearly not the appropriate first time. As far as Judge Chen's questions about tri-state buffers and output buffers, there's only one example, I think it's Figure 5 of the 907, that supports both Claim 14, which has tri-state buffers outputting data to the memory devices, and Claim 40, which was like output buffers, out-transmitting data to the memory devices. And they are, I believe, in the disclosed embodiment tri-state buffers, so they are buffers that are outputting data, therefore output buffers. So I don't think there's any issue, and certainly nobody has ever argued, that a tri-state buffer that is outputting data, transmitting data, for example, to memory devices, is an output buffer. Mr. Fowler, can I just ask, what in your perfect world, or if in your correct world, the Board precisely should have done? They insisted, but of course the standards are different. So then they get to your arguments, and in your view, your view is you've served the argument that this was just an obvious variant. What should they have done? Well, they should have agreed with me that it was an obvious variant. I'm talking about your APA arguments. They came up with this new ground that you didn't have the opportunity to respond to. So what procedurally should they have done to elide your concerns about due process? Yeah, well, instead of analyzing whether or not Ellsbury discloses both the input buffers and the output buffers, once they found the disclosed input buffers, they should have applied the law of obviousness, as set forth, for example, in KSR, and determined whether, based on the record evidence before them and the arguments, adding, further including the output buffers of Claim 40 would have been an obvious variation. And I don't see how they could have determined otherwise, given what they did with Claim 14 and finding that those tri-state buffers outputting data to the memory devices, they're an obvious variation of Ellsbury. Well, that goes to just Eric. Not on the due process. I mean, on your theory that they changed theories, or they introduced this new theory that you didn't have an opportunity to respond to. I'm directing your attention to the latter. Oh, I see. You mean if they had given me an opportunity to respond, I would have said that's not our argument. I mean, they should have said, you made this argument, but we're not buying it. But give us some more information about that. Make a different argument. Enhance your argument. What should they have done? Just on the due process argument. They should have just addressed the theory in the petition. Maybe I don't understand your question, Your Honor. I apologize. But we had one theory. Look, there are lots of ways to prove a claim is obvious, right? KSR puts half a dozen or a dozen of them, maybe. There are lots of ways to do it. Our whole argument is they needed to address the one we put in our petition. That would have avoided any due process or APA argument. And if they had disagreed with us, we probably would have appealed it anyway, and then you would have just been looking straight at the obviousness determination by the board. But if they had just addressed that one instead of the one they came up with themselves without telling anybody, that would have obviated the APA and due process arguments. But what if the board had simply looked at your very brief argument and concluded that your arguments in your petition were never about adding an additional buffer to the already existing buffer disclosed in Ellsbury? Your argument was just about implementing the one buffer in Ellsbury in a particular manner. And the problem, ultimately, is that with a claim like Claim 40, it requires two different types of buffers. And you never spoke to the question of why it would be obvious to add an additional buffer to the already existing buffer in Ellsbury. Well, first, obviously, I disagree with that characterization. But when you say what if, at least they would have been treating what I put in my petition rather than some other argument that was not in my petition. I think my time is up. We all heard the bell. Thank you very much. We thank both sides, and the case is submitted. Thank you, Your Honor.